UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>DUOLINGO, INC., LUIS VON AHN, and MATTHEW SKARUPPA,<br><br>Defendants. | Civ. Action No.<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System ("Plaintiff"), by Plaintiff's undersigned attorneys, on behalf of Plaintiff and all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Duolingo, Inc. ("Duolingo" or the "Company"), press releases and shareholder letters issued by Duolingo, public statements issued by Defendants, securities analysts' reports and media reports about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. This is a securities class action on behalf of all persons who purchased Duolingo Class A common stock ("stock") during the period between May 2, 2025 and February 26, 2026, inclusive ("Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

## BACKGROUND

2. Duolingo is a leading, U.S.-based mobile learning platform that primarily focuses on language learning. This case arises from a deliberate effort by Duolingo and its highest-ranking executives to conceal the negative impacts from the Company's push to increase monetization of its user base by bombarding them with relentless ads, upsells, and other sources of friction, while simultaneously increasing Duolingo's reliance on and use of rapidly generated AI content that was of worse quality than what the Company historically offered. All the while, Defendants assured

investors Duolingo was experiencing sustainable growth, including in critical metrics such as daily active users ("DAUs") and bookings (*e.g.*, users paying for Duolingo subscriptions).

3. Duolingo utilizes a "freemium" business model that lets users access its app and website free of charge, and also seeks to convert its free users into fee-based subscription services that claim to offer premium services and features. The Company generates revenue through its subscription offerings and the sale of ads to free users, as well as in-app purchases. By the start of the Class Period, the Company offered courses in over 40 languages to more than 46 million DAUs, with about 10% of the Company's users paying for subscriptions.

4. Historically, the appeal of Duolingo over other language-learning platforms has been exercises users can do at any time and for any length, blended with gameplay (sometimes called gamification), and with users strongly encouraged to maintain daily streaks. Indeed, many Duolingo users were known to have multi-year usage streaks, and Duolingo was known to regularly send its users reminders to log in and complete lessons, which helped maintain and boost DAUs. The Company also uses "widgets" that integrate directly into users' mobile devices and allow users to have additional Duolingo interactions without opening the full app.

5. Along with gamification, the Company leaned heavily into its online, social media presence to help boost DAUs. The Duolingo mascot, a green owl named Duo, exuded a strong personality and reminded users to log in and keep up their streaks. Duo was well known to Duolingo users, as Duo gave many nudges and prompts for users to complete their lessons. The Company's social media was often full of videos of young people and owls performing viral dance moves or hopping on to other social media trends, which the Company used to boost engagement and attract new users.

6. Despite its gamified look and social media persona, Duolingo is intensely data-driven. Throughout the Class Period, the Company ran thousands of A/B tests[1] to optimize each feature on its platform for maximum user engagement. Duolingo users complete over one billion exercises every day, generating large amounts of data to power the Company's high-volume A/B testing. The near-constant A/B testing allowed the Company and its highest-ranking executives to fully understand the impacts and trends resulting from changes to the Duolingo platform, including detailed data on the consequences of new features or business strategies. For example, describing the Company's heavy use of A/B testing, Duolingo's co-founder, Chief Executive Officer ("CEO") and chair of the board of directors ("Board") Luis von Ahn ("von Ahn") wrote in the Company's first quarter ("1Q") 2025 shareholder letter that, "[o]ur testing infrastructure allows us to explore hundreds of ideas at once, measure their impact rigorously, and let the best ones shape our product."

7. Demonstrating his intimate understanding of the Duolingo user experience, von Ahn stated in a pre-Class Period interview that a primary focus of Duolingo is user engagement, and that if users encounter "things that are frustrating, [that] frustration makes [users] leave." Von Ahn added that to ensure users were not frustrated, Duolingo would "actually just smooth [out the sources of frustration]." Von Ahn stated he understood that in an app setting like Duolingo, "the tiniest frustration" will cause users to leave and that Duolingo "just can't lose those users." To that end, DAU growth was a critical metric for the Company, which, during the Class Period, von Ahn described as "[p]robably the most important metric in the company" and one that he and other executives would be "looking at . . . a lot."

---

[1] A/B testing (or split testing) compares two versions (A and B) of something, such as an app feature, by showing them to different, randomly selected user groups to see which performs better at achieving a specific goal, such as higher clicks, sales, or user engagement.

8. At the start of the Class Period, Duolingo's subscription offerings were called Super Duolingo ("Super") and Duolingo Max ("Max"). Super is designed to offer additional features to enhance user learning without ads. Launched in 2023, Max is also ad-free, and is the Company's premium, highest-priced subscription tier. Duolingo promotes Max as giving users access to all the features of Super plus incremental features and exercises powered by AI technology, such as interactive AI video calls and role-playing with the Company's AI chatbot personality, Lily.

9. Following its introduction, Max quickly became a key part of the Company's business and Class Period push to monetize users. By the end of 2024, Max accounted for 5% of Duolingo's total paid subscribers, or almost half a million users. Max was expensive not only for users, but for Duolingo as well, who saw its gross margin decrease due to lower subscription margins from increased generative AI costs, due to the increased adoption of Max, lower advertising gross margin, and lower advertising revenue per DAU. Therefore, it was critical for the Company to maintain its DAU growth rates to funnel more users into the Company's subscription offerings, as advertising revenue per DAU decreases were offset by increases in subscription revenue as a percentage of total revenue. Von Ahn assured investors Duolingo was prioritizing using the latest AI models to deliver a high-quality user experience and lessons rather than concentrating on cost-optimization, and that AI costs would come down over time.

10. Duolingo also assured investors the Company was committed to the quality of the user experience even as it integrated rapidly created AI content into Duolingo's offerings. During the Class Period, however, the Company's monetization efforts reached previously unseen levels, and the quality of the Duolingo experience substantially declined as low-quality AI content weakened the app, including within its premium subscription tiers. Free Duolingo users were inundated with ads at levels not seen before, and even paying Super subscribers were aggressively

upsold and pushed to sign up for Max through consistent advertising and promotion, despite already paying to not see ads.

11. With increasing frequency, the Company forced free users to watch unskippable ads after each lesson, plus additional monetization ads for Super and Max, creating scenarios where free users were spending as much or more time on watching ads than lessons. The Company's ad push was so aggressive that it saw users snap years-long participation streaks just to avoid being bombarded with the Company's aggressive ad campaigns and monetization push. For Duolingo users, the ads became an incessant backdrop that defeated the purpose of learning and broke users' concentration.

12. Unbeknownst to investors, in another effort to boost monetization, Duolingo deliberately created friction for its free users. In April 2025, Duolingo rolled out a new feature called Energy, which replaced the Company's old system called Hearts. With the old Hearts system, users lost one heart for every wrong answer, and when their hearts ran out on a given day, they had to wait for their hearts to replenish. Under the Hearts system, free users who performed well could use Duolingo for extended periods of time.

13. Through the switch to Energy, Duolingo created a new system that caused free users to lose Energy with each correct answer. Thus, the more success a free user had on Duolingo, the less Energy they would have. While some Energy could be replenished by watching ads, the Company's real, undisclosed goal was to create friction for free users to try and force them into becoming paid subscribers. While Duolingo told investors that the new Energy system was rewarding and positively impacting DAUs and user engagement, it was actually adding friction, hindering the free user learning experience in order to boost monetization, and negatively impacting DAU growth rates.

14. As the Company focused on pushing users into subscriptions and upselling its highest-priced subscription tier, Duolingo lesson quality decreased, and users increasingly saw Duolingo as more of a game set up for monetization and less of a language learning tool. Rather than improve lesson quality simultaneously with its monetization push, Duolingo increasingly subjected users to low-quality, mass-produced digital content generated by AI.

15. To that end, on April 28, 2025, CEO von Ahn published an internal memo on LinkedIn, announcing the Company would "gradually stop using contractors to do work that AI can handle" and only add to human headcount "if a team cannot automate more of their work." The memo sent shockwaves through Duolingo's important social media channels as they digested the Company's new directive: "Duolingo is going to be AI-first." Making a "platform shift" to AI, von Ahn wrote, Duolingo needed to "create a massive amount of content," which could not be done manually, and added that one of the Company's "best decisions" was "replacing a slow, manual content creation process with one powered by AI." He sought to assure investors and the market, adding that "teaching as well as the best human tutors" was "within our reach" through AI, and that Duolingo needed "to rethink much of how we work." Von Ahn made clear the changes would be fundamental to Duolingo, adding, "[m]aking minor tweaks to systems designed for humans won't get us there" and "[i]n many cases, we'll need to start from scratch." Von Ahn signaled the Company had to move with "urgency" and was willing to "take occasional small hits on quality than move slowly and miss the moment." Von Ahn's missive added:

- We'll gradually stop using [human] contractors to do work that AI can handle
- AI use will be part of what we look for in hiring
- AI use will be part of what we evaluate in performance reviews
- Headcount will only be given if a team cannot automate more of their work

- Most functions will have specific initiatives to fundamentally change how they work

16. Von Ahn's AI-first announcement let loose a tidal wave of negative sentiment and criticism across many social media platforms. Comments on Duolingo's TikTok posts were "filled with rage" and included quality concerns about AI-generated content, perceived betrayal of "human connection" values, and broad concern about AI replacing human creativity. On TikTok, the epicenter of user backlash, the Company's 10.3 million followers documented themselves deleting the app, frequently sacrificing year-long streak achievements. Duolingo faced such an avalanche of negative feedback and comments that on May 17, 2025, Duolingo entered a social media blackout and wiped all content from its popular TikTok and Instagram accounts, leaving only cryptic messages as it lost scores of followers.

17. Users' fears of AI-slop and poor-quality content proved prescient. For example, even as Duolingo touted its "conversations with Lily" feature – where Max subscribers could engage in back-and-forth conversations with Lily, an AI-powered avatar – the quality of the conversations quickly nosedived. With increasing frequency, users suffered through translation errors, pronunciation errors, confusion in various courses, and lessons that were increasingly repetitive and not well structured. User complaints about AI-powered Max features, which were often wrong or unhelpful, substantially increased.

18. During the Class Period, as Duolingo pushed to monetize more users while inundating them with ads, poor-quality, rapidly generated AI content, and overall friction, Duolingo experienced deceleration in one of its key financial metrics and performance indicators: DAU. Despite closely following DAU trends through extensive data, Defendants assured investors the Company was on sound footing, experiencing sustainable growth with high-quality learning programs, and that it was adequately investing in long-term growth. For example, after reporting

its second quarter ("2Q") 2025 financial results, when DAU growth decelerated from 49% in 1Q 2025 to 40%, von Ahn attributed the DAU slowdown solely to the AI-memo backlash but assured investors "***that impact is in the past***."

19. Duolingo's true state of affairs came out in three partial Class Period disclosures. First, on November 5, 2025, the Company reported its third quarter ("3Q") financial results, revealing another sequential decline in DAU growth to 36%, a substantial drop from 49% in 1Q 2025 and 40% during 2Q 2025. Defendants revealed a reversal of the Company's monetization push and stated that going forward, the Company would prioritize user growth over monetization and that the Company needed to invest more in "teaching better across all our subjects."

20. In response, the price of Duolingo stock dropped sharply, falling 25%, or $66.28 per share, to close at $193.74 on November 6, 2025. Despite the steep decline, the price of Duolingo stock remained artificially inflated, as Defendants assured investors the strategy shift would only "shift the balance ***a little bit*** more towards user growth," resulting in "a change of ***small*** proportion" and a "relatively ***small*** financial impact from this kind of reprioritization," omitting that the shift was indeed a significant change and that Duolingo expected to see ongoing, material declines in DAU, bookings, revenues, and its financial outlook.

21. Next, on January 12, 2026, Duolingo announced that its Chief Financial Officer ("CFO"), Matthew Skaruppa ("Skaruppa"), had resigned. The Company also provided limited, preliminary fourth quarter ("4Q") 2025 operating metrics, shocking investors by revealing DAU growth of only 30% – nearly six points of additional deceleration from 3Q 2025. In response, Duolingo stock fell another 8.5%, or $14.92 per share, to close at $161.74 on January 12, 2026.

22. Then, after the market closed on February 26, 2026, Duolingo announced its 4Q 2025 financial results, confirmed the slowdown in DAU growth, and revealed the financial

consequences of its strategy shift were neither "small" nor "little"; rather, they would result in material negative impacts on 2026 bookings, DAU growth rates, revenue, and adjusted EBITDA. To that end, Defendants stated 2026 DAU growth would come in at a mere 20% and be accompanied by lower bookings and less profitability. Von Ahn admitted the Company's disclosures would come as a "surprise" to investors and that the Company would be running "thousands" of A/B tests in 2026 to improve its flagship app. Von Ahn further admitted that, during its monetization push, the Company deliberately introduced "friction" into the free user experience, which the Company and its high-ranking executives knew would cause users to leave the app and result in DAU slowdowns.

23. In response to these additional disclosures, the price of Duolingo stock fell again, dropping 14%, or $16.45 per share, to close at $101 per share on February 27, 2026.

24. As a result of Defendants' violations of the federal securities laws alleged herein, Duolingo investors suffered billions of dollars in losses.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over the claims asserted in this complaint pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

26. Venue is proper in this District pursuant to Section 27 of the Exchange Act. Duolingo is headquartered in this District and certain acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District. The Company's headquarters are located at 5900 Penn Avenue, Pittsburgh, Pennsylvania 15206.

27. In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

**PARTIES**

28. Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System purchased Duolingo stock during the Class Period, as set forth in the certification attached hereto and incorporated by reference, and suffered damages as a result of the conduct alleged herein.

29. Defendant Duolingo, Inc., incorporated in Delaware, operates as a mobile-first language learning application that teaches a variety of languages to users across the world. Duolingo stock trades on the Nasdaq under the ticker symbol "DUOL," and as of February 25, 2026, the Company had more than 40 million shares of stock issued and outstanding.

30. Defendant Luis von Ahn has served as the Company's CEO and as a member of its Board since co-founding the Company in 2011. Von Ahn has a PhD in computer science and describes Duolingo as "a very metrics-based company." Regarding his management style, von Ahn states that he is "see[ing] every single change that passes through the [Duolingo] app" and has stated, "I have a view of everything[.]" As CEO, von Ahn authored and signed quarterly shareholder letters to investors that were posted to the Company's investor relations website and filed with the SEC, participated in the preparation and dissemination of the Company's public filings with the SEC, spoke on behalf of the Company on conference calls, and signed the Company's SEC filings during the Class Period. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), von Ahn certified the accuracy of Duolingo's periodic reports filed with the SEC, including the Company's Forms 10-K and 10-Q issued during the Class Period.

31. Defendant Matthew Skaruppa was the Company's CFO for nearly six years, until he tendered his resignation as CFO on January 8, 2026, and was replaced as CFO on February 23, 2026. As CFO, Skaruppa was responsible for Duolingo's financial reporting, internal controls, and

public guidance. Skaruppa participated in the preparation and dissemination of the Company's financial statements and other public filings with the SEC, and spoke on behalf of the Company on conference calls during the Class Period. Pursuant to the SOX, Skaruppa certified the accuracy of Duolingo's periodic reports filed with the SEC, including the Company's Forms 10-K and 10-Q issued during the Class Period.

32. Defendants von Ahn and Skaruppa are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Duolingo, are collectively, "Defendants."

33. The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of Duolingo stock during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Duolingo's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pled herein.

34. Defendants are liable for: (a) making false statements; or (b) failing to disclose non-public facts known to them about Duolingo and the true market value of its stock. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of

Duolingo stock was a success, as it: (a) deceived the investing public regarding Duolingo's prospects and business; (b) artificially inflated the market price of Duolingo stock; and (c) caused Plaintiff and other members of the Class (defined below) to purchase Duolingo stock at artificially inflated prices and suffer damages as the true facts regarding Duolingo were revealed.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS**

35. The Class Period starts on May 2, 2025, following Duolingo's May 1, 2025 after-market-close announcement of its 1Q results for the period ended March 31, 2025, filing of its 1Q 2025 shareholder letter with the SEC, and filing of its 1Q 2025 Form 10-Q with the SEC, which was signed by von Ahn and Skaruppa. The Company's shareholder letter reported year-over-year DAU growth of 49% and stated Duolingo "added more [DAUs] than ever before – ***a clear sign that we continue to sustain meaningful growth at scale***" and added that "[b]ookings growth exceeded our prior guidance, ***driven by continued subscriber growth and the strong performance of our higher-priced plans like Duolingo Max and the family plan***." Pointing to "strong execution," the Company raised the midpoint of its 2025 bookings guidance to 29% year-over-year growth and the midpoint of its full-year adjusted EBITDA margin to 28% year-over-year growth.

36. The 1Q 2025 shareholder letter highlighted the Company's AI-powered learning and Max, stating that the Company was able to "***expand our learning content at an unprecedented pace***" and "***introduce nearly 150 new language courses for different geographies in Q1 using AI-generated content***." The shareholder letter added that rapid, efficient AI-generated content "***allowed us to grow both users and bookings while maintaining strong profit margins***."

37. The Company's earnings announcement quoted von Ahn as attributing DAU growth, which was more than any in the Company's history, subscriber growth, and revenue

growth to "***strong user momentum and increased adoption of our premium subscription tiers***." Von Ahn reiterated the Company's "momentum" through Max and highlighted that Duolingo's "***investments in AI have also helped us accelerate content creation***," and added that "we believe we're just beginning to scratch the surface of what we can offer our users."

38. On May 1, 2025, the Company hosted its 1Q 2025 earnings call, with von Ahn and Skaruppa fielding questions from market analysts. Discussing Duolingo's AI capabilities, von Ahn described how Duolingo was rapidly expanding its content through AI, stating, "***we're able to make the content for all of our subjects mostly – close to 100% automatically***" and adding that AI "***allows us to just have a lot more content that is made a lot faster and much cheaper***." Discussing the Company's ability to rapidly introduce new language courses through AI, von Ahn described adding "148 new language courses" in "about a year" and that "[a]ll of this content was done with AI," which he described as an "***an incredible speed-up***."

39. As the call continued, Defendants were asked about "strong and impressive growth rates" for DAUs, and Skaruppa attributed Duolingo's DAU growth rates to product quality improvements that were generating improved retention, stating:

> ***In terms of what drives the growth, it's the same story as has been two things drive our growth. One is product improvements, and the product improvements basically get improved retention of the product*** and also get people to tell their friends [or] word-of-mouth. ***And then the other thing that drives the growth is our excellent marketing campaigns***.

40. Discussing the Company's priorities for content creation, von Ahn stated the Company was "***always improving the content for the languages that we have and making it more and more advanced***" and attributed Duolingo's ability to "***actually regenerate the content super fast, but in an improved manner***" to the Company's "***pipeline on AI***[.]" Reiterating the Company's ability to rapidly produce high-quality content through AI, von Ahn added that AI

"***helps us teach better, it helps us create content a lot faster***" and that "***[i]t helps us create content that was just infeasible to do before***."

41. Discussing the Company's ability to increase adoption of the Company's premium subscription tier, Max, Skaruppa stated that the Company was "driving mix shift" to Max and that the Company's 1Q 2025 outperformance was driven by Super subscribers "converting up to Max subscribers." Skaruppa attributed subscriber growth to "***showing our current users, free and paid, the right plan at the right time to get to the right LTV***."

42. The statements in paragraphs 35-41 were materially misleading in light of contemporaneous information known to Defendants or recklessly disregarded by them, including that:

(a) DAU growth rates were being leveraged against deliberately added user friction in the form of significant increases in ad volume, subscription tier upsells, and worsened product quality, and Defendants understood that any amount of user friction would cause users to leave the app and, ultimately, negatively impact DAU growth rates;

(b) the Company's rigorous A/B testing demonstrated to Defendants that increased friction in the free user experience was having negative impacts on DAU growth rates;

(c) the Company's quickly generated AI content was worsening the quality of Duolingo's product offerings, negatively impacting the user experience and user trends, and threatening the sustainability of the Company's financial performance; and

(d) far from driving sustained growth and strong user momentum through content and "product improvements" that "get improved retention," the Company's constant A/B testing informed the Company that its monetization push and lower-quality, rapidly generated AI

content were degrading the Duolingo product experience and the value proposition of its subscription tiers.

43. On August 6, 2025, Duolingo reported its 2Q results for the quarter ended June 30, 2025, released a 2Q 2025 shareholder letter signed by von Ahn, and filed its quarterly report on Form 10-Q with the SEC, which was signed by von Ahn and Skaruppa. The Company's 2Q 2025 shareholder letter stated Duolingo's results were "***driven by product-led growth, a delightful learning experience, and fast iteration***." Based on purportedly strong user growth and engagement, and "subscription performance and profitability" that "exceeded expectations," the Company raised the midpoint of its full-year 2025 bookings guidance to 32% year-over-year growth and the midpoint of its full-year adjusted EBITDA margin to 28.75%.

44. In the 2Q 2025 shareholder letter, Duolingo stated DAUs grew at 40% year-over-year to 47.7 million, "an impressive result," that reflected "the strength of [Duolingo's] global brand" and its "***ability to continuously improve our app***." It added that DAU growth was "in line" with expectations and "a strong result given the comp from last year's exceptional Q2." The Company stated it was "able to outperform [its] expectations in . . . bookings in Q2" with "***robust subscription bookings across all tiers, and another strong quarter of bookings from [its] ads business***." Duolingo added that "[s]ubscription revenue per average paid subscriber, or ARPU, grew 6% year over year, primarily ***driven by more subscribers shifting to higher-priced tiers***." Addressing 2Q 2025 monetization and subscriber growth, the shareholder letter stated:

> Our subscription business continued to perform well, with growth across all tiers. ***We saw Super grow above our expectations this quarter driven by strong conversion. At the same time, Max, our highest subscription tier, has seen significant traction since fully rolling out less than a year ago***.

45. The 2Q 2025 shareholder letter also described the Company's new Energy feature, stating that it was rewarding users and creating a "***more motivating***" experience and describing

Energy as a "pacing system for free users that replaces Hearts." It added that "Energy is usage-based and ***rewards success–a carrot, not a stick***," and that Energy "***creates a more motivating and gamified experience, especially for new users who tend to make more mistakes***." The letter further stated that Energy was resulting in "***increased DAUs, median time spent learning well, and subscriber conversion***" and that touted Energy's benefits by adding: "***We have rarely seen a feature move more than one of these metrics, let alone all three***."

46. On August 6, 2025, the Company hosted its 2Q 2025 earnings call, with von Ahn and Skaruppa answering questions from equity analysts. Discussing the Company's DAU growth rate, which had moderated significantly from 60% year-over-year growth to 40%, at the low end of the Company's guidance for DAU growth of 40% to 45% for 2Q 2025, von Ahn pointed only to his April 28, 2025 AI memo, stating that "***the reason we came up towards the lower end was because I said some stuff about AI, and this was – I didn't give enough context***." Von Ahn added that the Company had adjusted its social media messaging to turn the "sentiment more positive," which he said "***has actually worked***." To quell investor concerns regarding further deceleration in DAU – which was one of the Company's critical performance metrics – von Ahn stated, "***that impact is in the past***." Von Ahn added the Company was "not guiding to DAU" because the Company "typically only guide[s] to DAU whenever there's going to be a big change." In other words, von Ahn signaled there would be no additional, significant DAU deceleration, clarifying that by not providing DAU guidance, "***that just should tell you that . . ., at least for next quarter, we're not expecting a big change from where we are now***."

47. When asked later in the call whether Defendants were concerned about DAU slowdown due to AI leading to subscriber loss and whether it could "change your view in terms of the rate of internal adoption of AI within the company," von Ahn pointed out that "we beat

bookings . . . we beat booking[s] pretty healthily" and added, "***We just don't believe that the effect of this is very material in terms of when you're looking at actual financial metrics***."

48. As the call continued, Defendants were asked about Duolingo's Energy feature. As he did during the 1Q 2025 call, von Ahn described Energy as substituting a "***carrot for a stick***" and "***rewarding***," and added:

> ***And what we have seen in when we're rolling this out is that this increases revenue or bookings and both. It increases [DAUs] [a]nd it increases the median time spent using the app. So we're really happy with this***.

49. Continuing, von Ahn added the metrics for the Energy feature were "***really good, both for [DAUs], revenue, [and] median time spent learning***," and underscored that he was keenly aware of Company-specific data regarding Duolingo's key metrics, stating, "we listen to the metrics." Von Ahn also added that on top of increasing DAUs, Energy was intended to drive revenue, stating Energy was "executing on that belief" that "if you use Duolingo a lot and you pay for Netflix, you should pay us. That is how we see it. And Energy basically accomplishes that."

50. The statements in paragraphs 43-49 were materially misleading for the reasons set forth in paragraph 42, and because:

(a) rather than creating a "more motivating" user experience, the newly rolled out Energy feature was designed to increase user friction and cap free user engagement in order to aggressively steer free users into subscriptions, and Defendants knew from historical experience and extensive A/B testing that the additional friction created by Energy would have negative impacts on DAU rates and cause users to leave the app; and

(b) the negative DAU slowdown was not "in the past" or attributed solely to von Ahn's AI-memo, but was expected to continue due to the ongoing monetization push, which relied on increased user friction and rapidly generated AI content that was lower quality than the Company's historical offerings.

51. After the market closed on November 5, 2025, Duolingo announced its 3Q earnings, issued a shareholder letter signed by von Ahn, and filed with the SEC the Company's 3Q 2025 Form 10-Q, which was signed by von Ahn and Skaruppa. The Company partially revealed the truth concealed by Defendants' prior false and misleading statements and omissions, shocking investors by announcing a long-term strategy change to pivot away from monetization and towards improving quality of teaching and prioritizing long-term DAU growth. Defendants disclosed that Max, the Company's AI-powered premium tier, was not converting sufficient numbers of users and that the premium gating strategy to force free users into subscriptions was hurting DAU growth. The Company's estimates for 4Q bookings ranged from $329.5 million to $335.5 million, missing analyst estimates of $344 million.

52. The Company's 3Q 2025 shareholder letter reported that DAU growth rates further decelerated, down from 40% year-over-year in 2Q 2025 to only 36% year-over-year in 3Q 2025. The shareholder letter pinned part of the DAU slowdown to Duolingo's decreased social media activity, with the Company posting "***less 'unhinged' content***" on its accounts, and added that the Company was increasing its social media posting and marketing spend to "help drive momentum, particularly in the US" and that "[t]hese actions support near-term user growth, but long-term gains will come from making our product even more engaging and effective."

53. To combat DAU deceleration, the 3Q 2025 shareholder letter revealed a seemingly seismic shift in the Company's business plan, including "investing proportionally more in ***teaching better***" and "***prioritizing user growth over monetization*** in the A/B tests that get launched." Specifically, the 3Q 2025 shareholder letter stated that "[i]n Q3 [Duolingo] decided to shift the balance" of the Company's focus "towards longer-term initiatives." It stated:

> ***In particular, we're investing proportionally more in teaching better, and we're prioritizing user growth over monetization in the A/B tests that get launched. This shift is reflected in our full-year guidance.***

54. On November 5, 2025, Duolingo hosted its 3Q 2025 earnings call, with von Ahn and Skaruppa answering questions from equity analysts. Discussing DAUs, von Ahn stated that for 4Q 2025, "we expect some amount of deceleration from Q3," but did not give guidance, stating, "we're not guiding to Q4 DAUs[.]" Von Ahn added, "we're not really guiding, for example, to next year[.]" Previously, when the Company did not give forward guidance for DAUs, Defendants made clear that such silence indicated "***we're not expecting a big change from where we are now***."

55. Discussing the Company's increased investments to improve the quality of its rapidly generated offerings (*i.e.*, teaching better) and prioritizing DAU growth over monetization, von Ahn stated that a turnaround would take a long time: "[it's] going to be years" and "we will be investing for a while, and that's important to know."

56. Nevertheless, during the 3Q 2025 earnings call, Skaruppa attempted to minimize investor concern and downplayed the impact of the Company's strategy shift on Duolingo's financial performance, framing it as "***a relatively small financial impact from this kind of reprioritization***." He added that it was "***a change of small proportion right now*** that is going to help us grow users for a long time, get users to do more lessons, learn better, spend more time on the app, and in general, be more engaged Duolingo users."

57. Later in the call, Defendants were asked about the bookings deceleration and revenue growth in 4Q 2025, and whether the slowdown stemmed from the conversion of users from free to paid in order to focus on subscriber growth, or whether other factors were the "main driver," including a reduction in retention amongst paid subscribers (*i.e.*, higher churn). In response, von Ahn downplayed user churn and stated, "the change in Q4 is pretty much because

of this shift to go to longer term initiatives" including prioritizing user growth and "spending relatively more effort, shifting some effort to teaching better which we're taking some of that from our monetization efforts." Further describing the Company's shift in strategy, von Ahn stated that "in terms of the metrics that we're going to be looking for, certainly user growth is an important metric that we're going to be that we're really keyed in on right now. Probably the most important metric in the company. So, we're going to be looking at that a lot."

58. As the call continued, Defendants were asked to discuss the Company's learnings regarding Energy. In response, von Ahn stated Energy "***did exactly what we wanted it to do***" by generating "***increased bookings and also increased [use]***."

59. Although the disclosure of the Company's need to pivot away from monetization and to focus more on improving product quality and prioritizing DAU growth removed some artificial inflation from the price of Duolingo stock, the statements referenced above in paragraphs 52-54, 56, and 58 were materially false and misleading when made for the reasons set forth in paragraph 50 and because they failed to disclose that Duolingo anticipated additional, material DAU slowdowns and rather than changes of "small proportion," investments in improving the teaching experience and prioritizing user growth over monetization, *i.e.*, removing deliberately introduced friction, stood to materially degrade the Company's 2026 financial performance and future outlook.

60. On November 6, 2025, despite Defendants' misleading positive statements, the price of Duolingo stock dropped more than 25% in reaction to Defendants' partial disclosures of the truth. Duolingo's announced strategy shift and lower-than-expected bookings also triggered a wave of downgrades and price target reductions from firms like Goldman Sachs, JPMorgan, and Wells Fargo, who noted that monetization was moved to the "backburner" and that the Company

would increase spending on long-term investments and marketing, such as its unhinged social media content, rather than near-term profits.

61. Before the market opened on January 12, 2026, Duolingo announced that CFO Skaruppa was resigning after nearly six years with the Company, effective as of February 23, 2026, and that he would be replaced as CFO by Gillian Munson ("Munson"). In the release announcing Skaruppa's resignation, the Company provided a preliminary update on its 4Q 2025 operating metrics, which included 4Q DAU growth of "approximately 30% year over year and bookings at or slightly above the high end of its previously announced guidance range of $329.5 million – 335.5 million." The Company's statement regarding 4Q DAU rates suggested nearly six points of additional deceleration from 3Q 2025 rates, and a substantial reduction from 49% DAU growth rates at the start of the Class Period. Thus, the January 12, 2026, disclosure revealed that the Company's DAU growth deceleration was continuing to drop by material amounts, contrary to what the market had been conditioned to accept by the Company not guiding to 4Q 2025 DAU growth rates in its 3Q 2025 earnings announcement.

62. In response to this unexpected news, the price of Duolingo stock fell again. After closing at $176.66 on January 9, 2026, Duolingo stock fell 8.45%, or $14.92 per share, to close at $161.74 on January 12, 2026, the next trading day after January 9.

63. After the market closed on February 26, 2026, Duolingo announced its 4Q and full-year 2025 results, and provided outlook for 2026. The Company once again shocked investors by revealing that the financial consequences of its shift towards DAU growth and away from its monetization focus – which Skaruppa previously described as "shift[ing] the balance ***a little bit*** more towards user growth[,]" "a change of ***small*** proportion[,]" and a "relatively ***small*** financial impact from this kind of reprioritization" – would result in material impacts on bookings growth

as the Company sought to revitalize DAU growth. It also confirmed that DAU growth continued its material deceleration in 4Q 2025 to 30%, and gave initial guidance for 2026 DAU growth of only 20%, suggesting another 10% of deceleration, along with 2026 guidance for bookings growth of only 10% to 12%, missing consensus estimates of 20% bookings growth, revenue growth of 15% to 18%, below consensus of 22% growth, and adjusted EBITDA margin of 25%, well short of consensus estimates of 30% adjusted EBITDA margin. For 1Q 2026, the Company guided to 11% bookings growth, 25% revenue growth, and adjusted EBITDA margin of 25.5%, all of which were below consensus market estimates.

64. In the Company's 4Q 2025 earnings release, von Ahn fully revealed the magnitude of the Company's shift in focus, stating Duolingo faced a "pivotal moment" and that "[i]n 2026, we are deliberately prioritizing user growth and teaching better" and that the Company would "focus on improving the free learner experience" at the expense of moderating near-term financial growth.

65. In the 4Q 2025 shareholder letter, von Ahn admitted the consequences of the Company's strategy shift "may ***come as a surprise*** to some investors," as he told investors to expect "***lower . . . financial results in the short term***" as the Company implemented its strategy shift to revitalize DAU growth instead of monetization. The shareholder letter further stated:

> But the short-term implication is that this year will see slower bookings growth and lower profitability. We expect bookings growth of around 11% in 2026, compared to the nearly 20% we believe we could achieve if we operated like we have in past years. Additionally, because we will offer AI features to more users and have slightly higher marketing spend, we expect our Adjusted EBITDA margin will decrease to about 25%.

66. During the Company's 4Q 2025 earnings call, von Ahn and newly appointed CFO Munson fielded questions from market analysts. Von Ahn started the call by noting that DAU rates would continue decelerating in 2026, and admitting that Duolingo "***needed to take more decisive***

***actions to re-accelerate DAU growth***." He added that in 2026, Duolingo would see "slower bookings growth and lower profitability," admitting, "I know it may come as a surprise to some investors[.]"

67. Von Ahn further admitted that the Company was well aware of the negative DAU growth consequences that came from adding friction, stating, "over the last 15 years" the Company knew that "[w]henever we remove friction from the free user experience, . . . DAUs grow." Later in the call, von Ahn admitted that the Company previously used friction – which was known to suppress DAU growth – to increase monetization and subscription rates, stating, "we found that the quickest way to increase monetization was basically by adding friction. The more we added friction, the more we got people to subscribe."

68. In response to these admissions and disclosures, the price of Duolingo stock dropped. After closing at $117.45 per share on February 26, 2026, Duolingo stock fell 14%, or $16.45 per share, to close at $101 per share on February 27, 2026.

69. As a result of Defendants' wrongful acts and omissions, and the subsequent declines in the market value of Duolingo stock, Plaintiff and other Class members suffered losses and damages.

**DUOLINGO STOCK TRADED IN AN EFFICIENT MARKET**

70. At all relevant times, the market for Duolingo stock was efficient for the following reasons, among others:

(a) Duolingo stock met the requirements for listing, and was listed and actively traded, on the Nasdaq, a highly efficient, national stock market;

(b) as a regulated issuer, Duolingo filed periodic public reports with the SEC;

(c) Duolingo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of investor releases

on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d) Duolingo was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e) unexpected material news about Duolingo was rapidly reflected in and incorporated into the price of Duolingo stock during the Class Period.

71. As a result of the foregoing, the market for Duolingo stock promptly digested current information regarding Duolingo from all publicly available sources and reflected such information in the price of Duolingo stock. Under these circumstances, all purchasers of Duolingo stock during the Class Period suffered similar injury through their respective transactions in Duolingo stock at artificially inflated prices and a presumption of reliance applies.

72. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because Defendants omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, positive proof of reliance is not required. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

73. During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions, and engaged in a scheme to deceive the market and a course of conduct

that artificially inflated the price of Duolingo stock and operated as a fraud or deceit on Class Period purchasers of Duolingo stock by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations, omissions, and fraudulent conduct became apparent to the market, the price of Duolingo stock fell significantly, as the prior artificial inflation came out of the price. As a result of their purchases of Duolingo stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about Duolingo was revealed through the disclosures specified herein, which removed the artificial inflation from the price of Duolingo stock.

74. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Duolingo's business and prospects. Defendants' false and misleading statements had the intended effect and caused Duolingo stock to trade at artificially inflated levels throughout the Class Period.

75. As a direct result of the disclosures identified herein, the price of Duolingo stock fell precipitously. This removed the artificial inflation from the price of Duolingo stock, causing real economic loss to investors.

76. The price declines were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market through partial disclosures. The timing and magnitude of the price declines in Duolingo stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Duolingo stock and the

subsequent significant declines in the value of Duolingo stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

77. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons who purchased Duolingo stock during the Class Period ("Class"). Excluded from the Class are Defendants, members of their immediate families, and officers and directors of Duolingo and their immediate families.

78. The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Duolingo stock trades on the Nasdaq. Duolingo has more than 40 million shares of stock outstanding, owned by hundreds, if not thousands, of persons, and there was a robust market for Duolingo stock.

79. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and each member of the Class purchased Duolingo stock during the Class Period and sustained damages from Defendants' wrongful conduct.

80. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

81. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable, and the damages suffered by individual members of the Class may be relatively small, making the expense and burden of individual litigation to seek redress individually for the wrongs done to them an impossible hurdle for members of the Class. There will be no difficulty in the management of this action as a class action.

82. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts and omissions as alleged in this complaint violated the Exchange Act; and

(b) whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

83. Plaintiff incorporates paragraphs 1-82 by reference.

84. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Duolingo stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

85. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and others similarly situated in connection with the purchases of Duolingo stock during the Class Period, in an effort to maintain artificially high market prices for Duolingo stock in violation of Section 10(b) of the Exchange Act and Rule 10b-

5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, as alleged below.

86. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Duolingo's business operations and financial prospects, as alleged herein.

87. Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Duolingo's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's business metrics and financial prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Duolingo stock during the Class Period.

88. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of Duolingo stock during the Class Period, because, in reliance on the integrity of the market, they transacted in Duolingo stock at artificially inflated prices and experienced loses as a consequence of the artificial inflation being released from the price of Duolingo stock as a result of the partial revelations and price declines detailed herein. Plaintiff and the Class would not have purchased Duolingo stock at such prices, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

89. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

90. Plaintiff incorporates paragraphs 1-82 by reference.

91. The Individual Defendants each acted as a controlling person of Duolingo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and participation in and/or awareness of the true state of the Company's business metrics and financial prospects, the Individual Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the press releases concerning the Company's business metrics and financial prospects.

92. As set forth above, Duolingo and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act.

93. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Duolingo stock during the Class Period because, in reliance on the integrity of the market, they transacted in Duolingo stock at artificially inflated prices and experienced loses as a consequence of the artificial inflation being released from the price of Duolingo stock as a result of the partial revelations and price declines detailed herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

A. Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as Lead Plaintiff under the Private Securities Litigation Act of 1995, and appointing Plaintiff's counsel as Lead Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 7, 2026

SAXTON & STUMP LLC
LAWRENCE F. STENGEL
PA ATTORNEY ID NO. 32809

*s/ Lawrence F. Stengel*
LAWRENCE F. STENGEL

280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: 717/556-1000
717/441-3810 (fax)
lfs@saxtonstump.com

TONYA A. SULIA
PA ATTORNEY ID NO. 204724
501 Grant Street, Suite 320
Pittsburgh, PA 15219
Telephone: 412/703-3966
717/441-3810 (fax)
tsulia@saxtonstump.com

ROBBINS GELLER RUDMAN
& DOWD LLP
ROBERT J. ROBBINS
KATHLEEN L. DOUGLAS
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
kdouglas@rgrdlaw.com

Attorneys for Plaintiff